UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON L. BELTON,<br><br>    Plaintiff,<br><br>    v.<br><br>J. GUTIERREZ, et al.,<br><br>    Defendants. | Case No. 19-cv-01909-WHO (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Dkt. No. 73 |

## INTRODUCTION

Plaintiff Vernon L. Belton alleges in this 42 U.S.C. § 1983 suit that Drs. Thomas Zewert and Phuc Lam provided constitutionally inadequate medical care for his hand injuries. Defendants move for summary judgment and have presented undisputed evidence that defendants provided timely, appropriate, and constitutionally adequate medical care. Belton has not filed an opposition and never asked for an extension of time to file one. On this record, defendants' motion for summary judgment is GRANTED.

## BACKGROUND

Belton alleges that on June 2, 2018, he was attacked by another inmate at Salinas Valley State Prison, resulting in a laceration to his left hand and a fracture to his right hand.[1] (Compl., Dkt. No. 1 at 3.) That same day he was examined by a nurse at the prison hospital, who cleaned and bandaged his laceration, and splinted his right hand. (*Id.* at 7.)

---

[1] The facts in the Background are undisputed unless specifically noted otherwise. In the Order of Service, the Court found his Eighth Amendment medical care claims against Zewert and Lam cognizable, and dismissed all other medical care claims. (Order of Service, Dkt. No. 12 at 2-3.)

An x-ray taken of the right hand on June 4 showed a comminuted fracture of the fifth metacarpal, volar misplacement and angulation, and associated soft tissue swelling. (Mot. for Summ. J. (MSJ), Dkt. No. 73-1 at 5.) Belton was seen by Dr. Lam two days later, on June 6. (*Id.*) Lam diagnosed a communited fracture at the fifth metacarpal bone of the right hand, recommended daily dressing changes for the laceration and continued use of the splint, prescribed ibuprofen and Tylenol 2 for pain, and sent a request for Belton to see a hand specialist. (*Id.*)

Belton was seen on June 15 by defendant Dr. Zewert, an outside surgeon. (*Id.*) Zewert noted the dislocation and laceration. (*Id.* at 6.) The laceration showed signs of infection, which Zewert thought might be caused by "mouth involvement."[2] (*Id.*) Zewert cleaned the cut, applied antibiotics, bandaged the wound, and placed Belton on a 14-day course of antibiotics, specifically doxycycline. (*Id.*) He recommended "performing urgent surgical procedures on both hands including reduction and pinning of the right fifth metacarpal with surgical exploration and washout and exploration and surgical exploration and washout of the left second metacarpal." (*Id.*)

Zewert informed Belton of the "risks, benefits, alternatives, and possible complications associated with the surgeries." (*Id.*) Belton indicated he understood and wanted to proceed with surgery, and signed the "Informed-Consent" forms for the surgeries, "as well as for the planned follow-up procedure for the removal of hardware that was to be inserted into his fractured metacarpal." (*Id.*) The forms authorized Zewert to perform "any related surgery or procedures other than or in addition to the above deemed necessary or advisable by the physician for therapeutic or diagnostic purposes during the course of the operation(s) or procedures described above." (*Id.*; Zewert Decl., Dkt. No. 73-4 at 42.) One procedure specifically authorized by the form was "LEFT SECOND METACARPAL EXPLORATION/WASHOUT." (*Id.*, Zewert Decl., Dkt. No. 73-4 at 42.)

The first surgery was scheduled for June 21. (MSJ, Dkt. No. 73-1 at 6.) Before the

---

[2] Belton stated the laceration was caused by a razor, rather than by "tooth involvement." (MSJ, Dkt. No. 73-1 at 6.)

1    procedure, Belton "signed another informed consent form acknowledging that the nature,
2    purpose, risks, complications, alternatives, and consequences of the operations had been
3    explained to him, that any questions or concerns he had, were answered, and that he
4    wished to proceed." (*Id.*)  The form stated the patient consented to "performance of any
5    related surgery or procedure . . . deemed necessary or advisable by my physician for
6    therapeutic or diagnostic purposes during the course of the operation(s) or procedure(s)
7    described above." (*Id.*)

8    During the first surgery, Zewert "reduced the fifth metacarpal fracture, repaired
9    both collateral ligaments and several of the small muscles around the fifth metacarpal, and
10   debrided the loose cartilage and bone in the joint." (*Id.*)  He "then thoroughly irrigated the
11   joint with a clindamycin (antibiotic) solution and then proceeded to stabilize the joint and
12   neck fracture with K-wire." (*Id.* at 6-7.)

13   Zewert treated the laceration by debriding the "ragged edge of the skiving injury
14   and then expanded the incision proximally and distally to expose the joint and observed
15   that two of the tendons in the dorsal aspect of the patient's left hand were completely cut."
16   (*Id.* at 7.)  He then "thoroughly washed-out the joint, and repaired the tendons and torn
17   radial collateral ligament." (*Id.*)  Zewert also "repaired the large dorsal sensory nerve that
18   had been transected and splinted both hands when he finished." (*Id.*)  Belton was
19   discharged with instructions to keep the area dry and intact, and with antibiotics (Keflex).
20   (*Id.*)

21   Belton was seen by Zewert for a post-operative evaluation on June 29. (*Id.*)  The
22   left hand was healing appropriately and was resplinted. (*Id.*)  Zewart thought that the
23   right-hand splint might be removed in two weeks, and an appointment was made for
24   removing the right-hand pin in three weeks. (*Id.*)

25   The second operation occurred on July 19.  Before surgery, Belton signed a consent
26   form similar to the one he signed before the prior surgery. (*Id.*)  During the procedure,
27   Zewert removed the stabilizing hardware from the right hand, confirming the removal by
28   examining the area fluoroscopically and visually. (*Id.*)  He "noted that the patient still had

3

significant adhesions and performed tenolysis on the flexor and extensor tendons to release the adhesions." (*Id.*)  He then "performed a dorsal capsulectomy of the proximal interphalangeal joint and metacarpal phalangeal joint." (*Id.*)   Also, "a rotational flap also had to be developed as the dorsum had hypertrophic scarring." (*Id.*)

Belton was seen by Zewert again on July 27. (*Id.*)  Zewert noted that Belton was healing well, discussed with him exercises for range of motion, scheduled a follow-up appointment, and prescribed ibuprofen for pain. (*Id.*)

At an appointment on September 14 with Lam, Belton said that he felt discomfort at the surgical sites and noticed a decreased range of motion at the right fifth finger and left index finger but no weakness or numbness in either hand. (*Id.* at 8.)  Belton said that he was participating in physical therapy and performing his range of motion exercises. (*Id.*)  He did complain that his current prescription for ibuprofen was not strong enough and asked for a narcotic. (*Id.*)  Lam found that the pain was not sufficient to warrant a narcotic; he recommended that Belton continue the ibuprofen and add Tylenol when needed. (*Id.*)  He further recommended that Belton continue therapy and his range of motion exercises. (*Id.*)

At an appointment with Zewert on October 26, Belton stated his left second finger was "doing well with some tingling, but there was decreased range of motion of his right fifth metacarpal." (*Id.*)  After an examination, Zewert determined that Belton's "right fifth metacarpal had an active ROM of 30° and a passive ROM of 20°." (*Id.*)  He thought that an urgent capsulotomy and tenolysis of the right fifth digit was needed. (*Id.*)

On November 29, Zewert operated on Belton for the last time. (*Id.*)  Prior to surgery, Belton again signed an Informed Consent form "which acknowledged that Dr. Zewert had explained to him the nature, purpose, risks, complications, alternatives, and consequences of the procedures to be performed and the patient indicated that he wished to proceed." (*Id.*)  During the procedure, Zewert noted "significant hypertrophic scarring of the dorsum of the right hand and severe stiffness of the right fifth digit with only 10-15° of motion at the metacarpophalangeal joint." (*Id.*)  He performed "a tenolysis of the muscles

4

around the joint as well as dorsal capsulotomies of the metacarpophalangeal joint, proximal interphalangeal joint, and distal interphalangeal joint which allowed for greater range of motion." (*Id.*) He "also performed a neurolysis of a dorsal sensory nerve and again performed a bipedicle flap closure to release the contracture of the skin and debrided the frayed cartilage from the base of the proximal phalanx." (*Id.*) Zewert sutured the incisions and splinted the right hand. (*Id.*) Belton tolerated the surgery well and his recovery was uneventful. (*Id.*)

Belton was seen by Zewert on December 7. (*Id.* at 9.) He found Belton well, though he was experiencing some pain. (*Id.*) He discussed range of motion exercises with Belton and created a night splint for the right hand. (*Id.*)

Belton was seen by Dr. Dorothy Do-Williams on January 18, 2019. (*Id.*) Do-Williams found that Belton was well and "was able to bend his right little finger with occasional tingling in the area for a few seconds." (*Id.*) After an examination, Do-Williams noted "there was full flexion of the right fifth digit metacarpophalangeal joint, proximal interphalangeal joint, and distal interphalangeal joint." (*Id.*) Belton had "full grip strength, sensation was grossly intact, and his pain was being controlled with acetaminophen and ibuprofen." (*Id.*)

Belton was seen by Zewert for the last time on January 25. (*Id.*) He found him "to be healing well bilaterally and reported that he was continuing to do his range of motion exercises." (*Id.*) Zewert recommended Belton return for a follow up in about six months, if needed. Belton did not have a return follow up. (*Id.*)

Belton has not filed an opposition to defendants' motion for summary judgment. He did file a motion for the appointment of counsel, which was denied. (Dkt. Nos. 68 and 72.) After his motion was denied, he filed a reply in which he advocated again for the appointment of counsel, owing to the complex medical discovery he received. (Dkt. No. 74.) He also states there is a dispute of material fact whether Zewert had "clear and expressed consent to perform said medical procedures on his left hand." (*Id.* at 1.) No such allegation appears in the complaint.

5

In his complaint, he alleges that he told Lam that "he was in severe pain and that he needed something to numb the pain."[3] (Compl., Dkt. No. 1 at 7.) He states that when he "awoke from surgery he discovered both hands had been operated on." (*Id.* at 8.) According to Belton, "Defendant Zewert explained to plaintiff that during his original surgery he noticed drooping of the left index finger, determined two tendons were severed on that finger, and he repaired it." (*Id.*) He further alleges that the physical therapy he was provided "was unsuccessful due to presumed complications from the June 21, 2018 surgery." (*Id.*) He also alleges he "continues to experience periodically extreme pain," "is unable to write without quickly experiencing extreme pain," and that his "anxiety and fearfulness have increased significantly." (*Id.*)

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

---

[3] Belton alleged that at this June 4 appointment, "Defendant Lam began telling plaintiff about defendant Zewert's work, and defendant Lam stated, 'Black people don't heal well.'" (Compl., Dkt. No. 1 at 7.)

1    Once the moving party meets its initial burden, the nonmoving party must go
2 beyond the pleadings and, by its own affidavits or discovery, set forth specific facts
3 showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court is
4 concerned only with disputes over material facts and "[f]actual disputes that are irrelevant
5 or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the
6 court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91
7 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with
8 reasonable particularity, the evidence that precludes summary judgment. *Id.* If the
9 nonmoving party fails to make this showing, "the moving party is entitled to a judgment as
10 a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

## DISCUSSION

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (equating the standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

The Supreme Court has further clarified this standard by holding that "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A mere accident or evaluative mistake is not to be characterized as wanton infliction of unnecessary pain. *Estelle*, 429 U.S. at 105.

1    A plaintiff must show that his doctors or nurses embarked on a course of "medically
2    unacceptable" treatment in "conscious disregard of an excessive risk to [his] health."
3    *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004).  A claim of mere negligence
4    related to medical problems, or a difference of opinion between a prisoner patient and a
5    medical doctor, is not enough to make out a violation of the Eighth Amendment.  *Id.*;
6    *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

7    Defendants have presented undisputed evidence that Drs. Zewert and Lam provided
8    constitutionally adequate medical care.  Belton was attacked on June 2, 2018 and his
9    wounds were examined and treated the same day; an x-ray was taken on June 4 and Belton
10   was seen by Lam on June 6, when he was given a diagnosis, pain medication, instructions
11   for taking care of his wounds, and a referral to a specialist.  He saw Zewert on June 15,
12   who cleaned the wound, applied antibiotics and bandages, and started him on antibiotics.
13   Zewert discussed surgical treatment with Belton, who agreed to such treatment and signed
14   a consent form.  Zewert operated on Belton on June 21 and saw him for a surgical follow-
15   up on June 29, where it was observed that he was healing well.  A second operation
16   happened on July 19 and Belton saw Zewert on July 27 for a follow-up.  It was noted then
17   that Belton was healing well, and Zewert discussed exercises and prescribed ibuprofen for
18   pain.  Belton saw Lam on September 14 at which Belton disclosed he was experiencing
19   discomfort and asked for a narcotic for the pain.  Lam concluded that the pain did not
20   warrant such treatment and recommended Belton continue his ibuprofen and exercises.

21   Belton saw Zewert on October 26, at which time Zewert examined Belton and
22   determined that further surgery was needed.  Surgery occurred on November 29 and there
23   were no recovery complications.  Zewert saw Belton on December 7 and found him to be
24   healing well.  A night splint was created for Belton and Zewert discussed exercises with
25   him.  On January 18, 2019, Belton was seen by Do-Williams, who noted that he was doing
26   well, had full flexion of various joints, had full grip strength, sensation was grossly intact,
27   and his pain was controlled by medication.  Belton had a final meeting with Zewert on
28   January 25, at which time he noted that Belton was healing well and was performing his

exercises. A further follow-up was recommended, but Belton did not return for one.

This undisputed evidence indicates that defendants provided Belton with timely and appropriate medical care. He was examined promptly and repeatedly, given surgical treatment (each surgery treating his conditions they changed), as well as medication and therapeutic exercises. This shows attention and care, not deliberate indifference. Though Belton contends Lam did not provide him the medication he wished, that does not indicate the "obduracy and wantonness" that characterize the conduct prohibited by the Eighth Amendment. *Albers*, 475 U.S. at 319. Lam did provide Belton with medication aimed at treating his pain.

The soundness of the treatment is supported by the declaration of Dr. Gordon Levin, who was retained as an expert by defendants' counsel. Levin states that he has "significant experience with the care and treatment of hand injuries and surgical repairs." (MSJ, Levin Decl., Dkt. No. 73-3 at 2.) In his declaration, Levin also opines that after reviewing the medical record he concluded without equivocation that "all of the care and treatment provided to Mr. Belton by Dr. Zewert were, at all times, in compliance with the standard of care." (*Id.* at 7.) He found "no deviation from the usual and customary care and treatment of the injuries to Mr. Belton's right and left hands by Dr. Zewert at any time." (*Id.* at 11.) "Furthermore, it is also my opinion that Dr. Zewert's care and treatment of Mr. Belton was not a substantial factor in bringing about any of the plaintiff's alleged injuries, if any there are." (*Id.*)

Belton did not file an opposition to the motion for summary judgment. A district court may not grant a motion for summary judgment solely because the opposing party has failed to file an opposition. *See Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994) (unopposed motion may be granted only after court determines that there are no material issues of fact). This is so even if the failure to oppose violates a local rule. *See Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003). But a court may grant an unopposed motion for summary judgment if the movant's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact. *See*

9

1  *United States v. Real Property at Incline Village*, 47 F.3d 1511, 1520 (9th Cir. 1995) (local rule cannot mandate automatic entry of judgment for moving party without consideration of whether motion and supporting papers satisfy Fed. R. Civ. P. 56), rev'd on other grounds sub nom. *Degen v. United States*, 517 U.S. 820 (1996); *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir. 1993) (same).

The evidence presented by defendants supports their motion for summary judgment and Belton presented no evidence (and therefore has not shown a genuine dispute of material fact) that he received constitutionally inadequate medical care. The defendants' are sufficient to support the motion and do not on their face reveal a genuine issue of material fact.

Belton's other filings do not change this conclusion, even if they could be considered as an opposition to the motion for summary judgment. In a recent filing, Belton raises for the first time that there is a dispute of material fact whether Zewert had "clear and expressed consent to perform said medical procedures on his left hand." (Dkt. No. 74 at 1.) No such allegation appears in the complaint and Belton cannot now raise it as an issue. Even if this issue had been properly raised (and even if the reply can constitute an opposition), his allegation is undone because he has not submitted any evidence in support, and because he consented to the June 21 surgery. That consent expressly stated that the patient consented to the "performance of any related surgery or procedures other than or in addition to the above deemed necessary or advisable by the physician for therapeutic or diagnostic purposes during the course of the operation(s) or procedures described above." (MSJ, Dkt. No. 73-1 at 6; Zewert Decl., Dkt. No. 73-4 at 42.) One procedure specifically authorized by the form was "LEFT SECOND METACARPAL EXPLORATION/ WASHOUT." (*Id.*) Belton does not dispute that he signed the consent form.

Levin also notes that Belton consented to a surgical "exploration and washout" of the "left second metacarpal." (*Id.*, Levin Decl., Dkt. No. 73-3 at 8.) He further notes that during the exploration, Zewert "found that the tendons on the dorsal aspect were

10

completely severed, the radial collateral ligament was over 50% torn, and the large dorsal sensory nerve was transected." (*Id.*) "From a technical standpoint, the repairs were adequately and properly performed." (*Id.*) "From a standard of care perspective, it was appropriate and entirely within the standard of care for Dr. Zewert to perform these repairs at the time of the surgery as they were clinically indicated and medically necessary." (*Id.* at 8-9.) Had Zewert not repaired the tendons, they "likely would have shortened and become irreparable, which would lead to a loss of motor function." (*Id.* at 9.) Had Zewert not repaired the torn radial ligament, "the entire joint risked becoming unstable." (*Id.*)

Belton's allegations in the complaint do not create a genuine issue of material fact. Experiencing hand pain and difficulty writing are expected results considering the severe hand injuries he suffered and the consequent extensive surgical treatment he received. They do not indicate that defendants embarked on a course of "medically unacceptable" treatment in "conscious disregard of an excessive risk to [his] health." *Toguchi*, 391 F.3d at 1058-60. Dr. Levin declares that "it is not uncommon to experience pain following the significant surgeries to both hands that Mr. Belton underwent in this case and there is no indication in the records that the pain he experienced deviated in any way from the normal postoperative course." (MSJ, Levin Decl., Dkt. No. 73-3 at 10-11.) Also, "the reason Mr. Belton may be experiencing the alleged pain symptoms is due to the fact that the nerve was severed in the first place, during the altercation, and there is no evidence in the medical records to suggest that Dr. Zewert's care and treatment was a substantial factor in causing this alleged, ongoing pain." (*Id.* at 11.) Furthermore, Belton has offered no evidence linking defendants' treatment to his current anxiety. For all of these reasons, defendants' motion for summary judgment is GRANTED.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. (Dkt. No. 73.) The Clerk shall terminate Dkt. No. 73.

Because there is a second pending summary judgment motion against the remaining defendants, judgment cannot be entered now. A judgment in favor of Zewert and Lam will

11

be entered at the conclusion of this action.

**IT IS SO ORDERED.**

Dated: August 16, 2021



WILLIAM H. ORRICK
United States District Judge